## Case No. 8,523.

### LOTTIMER et al. v. SMYTHE.

[17 Int. Rev. Rec. 12.]

Circuit Court, S. D. New York. Nov. 14, 1871.

CUSTOMS DUTIES—ACT 1864—SILK CRAPES—PIECE SILKS—SILK NOT OTHERWISE PROVIDED FOR.

This action was brought in 1867 to recover an excess of duty of 10 per cent., collected by the defendant as collector of the port of New York on silk crapes. The defendant claimed said goods were liable to 60 per cent. duty, under the 8th section of the tariff act of 1864 [13 Stat. 210], as "piece silks." The plaintiff claimed the goods were subject to a duty of 50 per cent. under the latter clause of the same section, as being "manufactures of silk not otherwise provided for." Verdict for plaintiffs.

[Cited in Morrison v. Arthur, Case No. 9,842; Arthur v. Morrison, 96 U. S. 110.]

[Action at law by William Lottimer to recover of Henry A. Smythe, collector, an excess of duty paid on certain goods. Tried before a jury.]

Defendant's counsel offers in evidence the opinion of the board of appraisers of the New York custom-house, dated September 15, 1864. (Objected to.) Offered, not as deciding the law, but as a fact that the official board of appraisers, in 1864, passing on this question, whether silks in the piece included crape, decided that it did. Excluded. Defendant excepts.

John Van Arsdale called by the defendant. Sworn. Defendant's counsel offers in evidence the entry made by William Lottimer & Co., the plaintiffs, by the steamship City of Limerick, dated New York, 24th July, 1863. Objected to. Admitted. Plaintiffs except. Defendant's counsel reads from the entry:

No. 601,     1 case silks.
    602,     1 case ditto.
    603,     1 case ditto.

Also offers in evidence, accompanying the entry, the invoice, and reads therefrom:

No. 601,     25 packets 4-4 folded crape.
    602,     20 packets 4-4 folded crape.
             15   "   6-6   "
    603,     10,264 1-2 yards 3-4 rolled crape.
             12,354   "   "
             12,162 1-2   "   "

Also the classification in the custom-house on the invoice:

"Manf. silk, costing under one dollar per square yard, 30 per cent."

On the entry is the classification return from the appraiser's office: "Return—Silks under one dollar."

Q. Did you look up these several invoices and entries? A. Yes, sir. Q. Are these all you could find of the firm of Lottimer & Co. after the act of 1861 [12 Stat. 178], and prior to the act of 1864 [supra]? A. Yes, sir. Q. You are an officer in the custom-house? A. Yes, sir. Q. You are in charge of the record room, where all these papers are kept? A. Yes, sir.

Defendant's counsel offers entry by the steamship Kangaroo, dated 21st January, 1863:

No. 2,009,     1 case silk crape.
    2,010,     1 case silk crape.
    2,011,     1 case silk crape.
    2,012,     1 case silk crapes and neckties.

On the entry is the return from the custom-house: "Silks, under one dollar, from 40 to 30 per cent."

Defendant's counsel also puts in evidence the invoice accompanying the entry:

No. 2,009, 23 packets 4-4 folded crape, 22 inches wide.
           13   "   "   21 inches wide.
            9   "   "   21 inches wide.
    2,010,  9   "   "   allow 1-2 yard, 26 inches wide.
           16 packets 4-4 folded crape.
           20   "   "   27 inches.
            3   "   "   28 1-2 inches.
    2,011, 32,623 1-2 yards 3-4 folded crape, 36 inches wide.
           28,458   "   "   36 inches wide.
           20,330   "   "   38 inches wide.
    2,012, 28, 89 yards folded crape 42 inches wide.
           476   "   5-4   38 inches wide.
            3 packets   4-4   28 1-2 inches wide.

Defendant's counsel also offers the invoice by the steamship Asia, 15th February, 1863:

Z. 600, 1 case silk crapes.
        6 pieces 4-4 colored crape.
"Return silk under one dollar, 1,319 yards, $247."

Also puts in evidence entry of William Lottimer & Co. per steamship City of London, dated 17th May, 1864:

ZZ. 2,033, 1 case silk crape.

Return from the appraiser's office: "Silks under one dollar, 1,620 yards, $1,486.40."

Also the invoice accompanying the entry, dated May 4, 1864, describes the crapes in this way:

Z. 2,033, 163 yards ground Aerophine.
152 1-2 yards light ground Aerophine.
164 yards Bische.
223 yards drab, 99 Vert novo.
160 yards green.
32 yards rose.
99 yards blue.
165 yards Lyon.
160 yards violet.
267 yards, 1,944 1-2 maize.

All under the general head of "Aerophine."

English crapes under one dollar per square yard.

Also puts in evidence the entry by the steamship the City of Washington, dated November 30, 1863, entry of silk crape. Also the invoice describing it as folded crape and folds of rolled crape. Eight entries of folded crape and five entries of rolled crape. The entry is "one case silk crape."

Q. Did you bring up with you all the entries of William Lottimer & Co. you could find between the dates named? A. Yes, sir.

(These entries and invoices are taken subject to the exception of plaintiffs' counsel.)

Defendant's counsel also offers specific entries of A. T. Stewart & Co. and of Lord & Taylor, and other houses than the plaintiffs, of the same form, entered as silk crape—invoice calling it folded and rolled crape—classified as silk. This evidence is not offered with the intention of impeaching or contradicting any witness. Objected to. Excluded. Defendant excepts.

Defendant's counsel puts in evidence the samples shown to the witnesses, as illustrating the testimony of the witnesses who have spoken of them. Plaintiffs' counsel objects to anything which is not black crape. Admitted. Exception. Defendant rests.

Plaintiffs' counsel calls Harrison Millard, who being duly sworn, testified:

By Mr. Curtis: Q. Are you a clerk in the custom-house? A. Entry clerk; yes, sir. Q. How long have you been in that capacity? A. Four or five years. Q. Can you state definitely when you went into that position? A. I could not remember now; it is. four or five years ago that I held the position of entry clerk; I have been seven or eight years in the custom-house in other departments. Q. You were there in 1867 as entry clerk? A. Yes, sir. Q. I wish to know according to the custom—the practice in the custom-house—what is the first step a merchant, or his agent, has to do when he comes to make an entry? A. He gives the entry to the entry clerk to pass—that is the first step—containing the invoice and the bill of lading, and the entry made out in due form. Q. Is that paper (handing invoice per City of Baltimore to the witness) what is commonly known as an entry? A. Yes, sir. Q. Suppose the invoice, which a merchant or his agent brings to the custom-house, specifies folded crapes, how is it necessary that he should enter them on the entry paper? A. Folded crapes. Q. Suppose the invoice specified folded crapes? A. You must enter them according—

Defendant's counsel objects on the ground that the form of the entry is prescribed by statute, and cites from Bradley's Digest of the Statute, (sections 2, 3, p. 355), being the act of March 2, 1799 [1 Stat. 657]. Objection sustained. Exception.

Q. Suppose that when the entry specifies folded crapes, when the invoice specifies folded crapes, and the merchant enters them as silk crapes—of what does that inform the entry clerk?

Objected to.

The Court. I cannot conceive that this witness is any more competent to speak of that than a juror.

Mr. Curtis. He is the officer whose duty it is to pass the goods, if the entry is in conformity of law and the requirements of the office.

The Court. Here is a witness called to speak of a transaction in 1867, about the time when he entered upon his duties, and he is asked in reference to an entry of folded crapes, what the language of "silk crapes" informed him. He is no more competent to speak of that than a juror.

Q. Suppose the invoice specifies folded crape and he enters them as crapes, or as folded crapes, would you or not pass the entry in that form?

Objected to.

The Court. The question whether it is a compliance with the law, is a question of law.

Q. When a merchant makes an offer to enter goods at the custom-house by bringing his invoice and his entry, can he or not get possession of his goods until he has paid the highest duty which the entry clerk may require him to pay, according to the specification of the goods in the entry?

Defendant's counsel objects, on the ground that it is a question of law. Objection sustained. Plaintiffs' counsel makes an offer of proof. The court stated that it could only rule on questions. Plaintiffs' counsel excepted.

Mr. Curtis. I offer to prove by the entry clerk, who was in the office at the time the entry in question was made, that it is the practice at the custom-house to require a merchant offering to make an entry of crapes to specify in his entry whether they are made of silk or some other material; that when he has described them as silk crapes in his entry he is required to pay the duty—the highest duty that the law levies on silk goods—and that he cannot be allowed to make the entry until he has paid that highest duty. I further offer to prove by the same witness, that unless the party specifies in his entry in the case of such goods as crapes the material of which they are made, he would not be allowed to make the entry. I further offer to prove by the same witness, that if the entry were to describe the goods as silk crapes, and the party were to offer to pay fifty per cent. duty under the act of

1864, he would not, according to the construction of that act then acted upon in the custom-house have been allowed to enter them at all. That is the substance of the evidence which I offer.

Mr. Davis. Do I understand that that is received by the court as an offer?

Mr. Curtis. It is stated simply as the purpose for which I wish to use the witness.

The Court. Put your questions; if objected to I will rule upon them.

Mr. Curtis. Does your honor decline to rule upon this?

The Court. There is no question upon which to rule.

Plaintiffs rest. Testimony closed.

B. L. Ludington and Geo. Ticknor Curtis, for plaintiff.

Noah Davis, Dist. Atty., for defendant.

WOODRUFF, Circuit Judge (charging jury). The controversy between the parties to this suit is said to be, and no doubt is of importance. An importance extending beyond the small amount which is involved in this particular action. It is important so far as the government is concerned, because it affects the revenue derivable from importations, which are shown on this trial to be of a very considerable amount. It is important, so far as the plaintiff and other importers are concerned, because it affects the amount which they are to pay to the government on importations of large quantities of goods. It is also proper to say that it is a controversy which, although it involves a conflict of interest and a conflict of opinion, is to be viewed not as hostile in any other sense. The government asks of its citizens and residents who import articles of foreign growth and manufacture, that they contribute to the revenue of the government, whatever by law is required; the government should seek, and I trust its officers do seek that and nothing more; and the defendants I trust, as citizens, on their part are willing to pay what the law requires. They ought not to be required and are justified in not expecting to be required to pay more. And, therefore, when a difference has arisen between the government officers and the defendants as to what is the true amount to be paid, it is proper calmly and dispassionately to consider what the government has a right to require, and what it is the duty of the merchants to pay. Upon such a conflict of opinion (and I trust in the spirit I have suggested to you) the plaintiffs here have brought their action to recover back what they claim to be an excess of duty exacted from them by the defendant, when in the office of collector of this port, upon importations of crapes. It has been correctly stated that when the defendant in his official position required, as a condition of giving up the government control and custody of the plaintiffs' goods, that they should pay a sum of money which was assessed thereon, and the plaintiffs objected and protested, and complied with all the proper formalities (which are not now called in question) but submitted and paid, the defendant receiving the plaintiffs' money is bound to justify his exaction; and in this case the defendant has the burden of showing to you, so far as you are called upon to pass upon the facts, that the exaction that he made was a lawful exaction. He seeks to do this by appealing to the act of congress, which has been repeatedly adverted to in your hearing, and he claims that under the law the exaction which he made was not more than was due to the government which in that behalf he represents. The clause of the statute referred to is the section and paragraph which imposes on all dress and piece silks, ribbons and silk velvets of which silk is a component material of chief value, 60 per cent. ad valorem. I understand the defendant or his counsel to rest his justification solely upon that language, and even upon a few words of that language "on all piece silks;" while on the other hand the plaintiff insists that the language "piece silks" does not describe the goods in question at all, and that although they were subject to duty, it is to another duty, at another rate per cent. described in a subsequent clause of the section "on all manufactures of silk, of which silk is the component material of chief value." That presents in very broad, general terms the controversy between these parties, namely, whether the goods that were imported by the plaintiff and which were the subject of the exaction complained of are "piece silks" within the meaning of the first-named clause of this statute, or whether, being manufactured of silk, as it is conceded they are, they are without that description and left to be included in the more general final summing up of the section under the terms "all manufactures of silk not otherwise provided for."

In general the construction and effect of a statute devolves upon the court as matter of law. But sometimes the subject to which the statute relates is of such a nature that a knowledge of facts not appearing in the statute in order to a just application of the terms of the act—facts which the court cannot judicially know, and which it is for the jury to determine upon the evidence. In other words if there were nothing in the statute before us that involved anything but that which the tribunals of justice were bound judicially to know and take cognizance of, no question could arise which would involve an inquiry by the jury. But it is true of some statutes, and especially or more frequently true of statutes regulating imports that there should be a knowledge of extrinsic facts outside of the statute, in order to give an interpretation and application of the statute to the subject matter of the controversy. That leads to the condition in which this case now stands. The more

general question, as I stated to you, is whether this statute imposes a duty of 60 per cent. upon these goods? The court can interpret the statute when the facts are ascertained; but the statute employing terms the meaning of which the court does not necessarily know, a question of fact arises which is brought here for your determination. That question of fact has been correctly stated to you by both the counsel: Are the goods which were the subject of the exaction now complained of "piece silks" in the sense in which that term is used in the statute, or are they left unprovided for by that language, and therefore do they fall within the concluding paragraph "manufactures of silk not otherwise provided for." I say that is the question, and it is to be answered by an inquiry couched in a somewhat different phrase—are the goods in question "piece silks?" Are they included within the term "piece silks" according to the known commercial use of these terms. The statute uses these terms in their commercial sense. Statutes regulating duties on imports are intended to regulate and control or affect trade and commerce, and are addressed not merely to revenue officers but to merchants and dealers whose interest and whose business are to be affected by those laws—those who import and deal in the subjects upon which duties are imposed—and therefore descriptive terms employed in such statutes are to be taken according to their known signification in trade and commerce. But in reference to this particular case another observation and another rule becomes important; for I understand it to be claimed on the one side and conceded upon the other that the term "piece silks" is not in commercial use as a technical designation of any silks whatever. Another rule therefore becomes important in this particular case, viz., that when general terms are used the terms are to be taken and applied in their ordinary and comprehensive meaning unless it is shown (as I understand it is not claimed to be shown in this instance), that they have in their commercial use acquired a special and restricted meaning. That is to say if "piece silks" is a term of general meaning in its ordinary acceptation and it be not shown that it is a term used in commerce to designate anything save only that the goods are silks, then it is to be taken in its general and natural signification to embrace all silks imported in the piece. I understand it to be also claimed on the one hand and conceded on the other that the term as used in the statute embraces all silks manufactured and imported in the piece, and as distinguishing goods thus imported from goods that are imported in a set form or pattern adapted to a particular and specific use. I understand the counsel for the plaintiff, and in this he exhibits great candor and fairness towards the defendant, to concede that the term "piece silks" does mean silks imported in the piece, and that it does not describe distinctively any kind of silks so imported.

Mr. Curtis. Any one kind.

The Court. Any one kind of silks so imported; and further, that in commercial language there are no silks known as "piece silks." I understand the counsel even to go another step, and there is no doubt about it, that the goods in question are made of silk and are imported in the piece. Now, gentlemen, in this view of the meaning of the term "piece silks" and the absence of any known technical meaning to that term in trade or commerce, I feel constrained to say that it includes all silk goods made and imported in the piece according to its general and its ordinary signification, and that it therefore embraces crape, unless you are satisfied that crapes in trade and commerce—among men concerned in the business of importing and dealing in crape, are not known as silks. Unless crapes are shown to your satisfaction not to be known as silks then (under the concession that crape is imported in the piece and is made of silk), crapes fall within the designation of piece silks and were liable to the duty exacted by the defendant. The defendant on this subject, as you will have perceived, claims, in relation to this term "crape," that these goods, the subject of this importation, are known in trade and commerce as a particular kind of silk, and that the term "crape" is a term of discrimination among silks and nothing else; that although it may be true that popular language (used by the ordinary public in speaking of these goods) employs the term "crape" and nothing else, yet that it is so employed only as a means of discrimination between that and other kinds of silk goods, and that although the consumer when he wants that kind of goods inquires for crape, he does what the consumer does who wants satin, viz.: he inquires for satin; just as also when the consumer wants taffeta, he asks for it by its specific name, and not by its general designation, silk; when he wants gros de nap, he asks for gros de nap; when he wants canton crape, he asks for canton crape, and so through all the long list of silk goods imported in the piece which it is not worth while, nor indeed is it in my power to enumerate. The claim is, that the term "crape" is like the terms "taffeta" "gros de nap," "poult de soit," "canton crape," and various others that have been named here. That although these are distinctive terms, they are distinctive only as a discrimination between kinds of silk, according to the use of that term among importing merchants and those who deal in them, and those to whom the tariff laws are addressed. That they are not used as definitions withdrawing them from the more general term silks as it is used in this country; but that each and all of them, whether designated by one name or the other, are shown by the testimony to be known by those who are engaged in the busi-

ness of importing and dealing in these goods as silks, and each is so known as much as either of them. That presents I think with distinctness and with as much clearness as at present I can. the view which the defendant takes of this subject—that the goods are imported, that they are made of silk, that they are known among commercial men as silks and are imported in the piece, and that although it is true as appears from the evidence that they are more popularly known as "crape," as another kind of silk is known as "taffeta," and another kind as "gros de nap," and another kind as "canton crape," and so on through the list, yet that these are subordinate terms which have grown into use for the reason that persons wishing to get a specific kind of silk employ the term which is best suited to indicate tne specific kind of silk goods which they want, and hence have passed into popular use, which is not to be made a test of the interpretation of the statute. On the other hand the plaintiffs insist that crapes are not known in trade and commerce at all as silks; and the counsel for the plaintiffs are perfectly correct when they insist that the question to be determined here does not depend on the mere fact that crapes are made of silk, or that they are made chiefly of silk combined with gums, which the witnesses say are used for stiffening these and other silks; that if the article is not known in trade and commerce under the designation of silks, then it is quite immaterial for the purposes of the claim of the plaintiffs here whether they are made of silk or not. The amount of duty is to be determined by the commercial designation. I say on that subject that the claim of the plaintiffs is entirely correct, nor is it in conflict with the claim which I have stated on the part of the defendant. Both come to the question whether these goods are known in trade and commerce, and especially among those who import and deal in them. as silks or not. That presents precisely the question of fact; it brings this controversy down to a very narrow point, which you are to pass upon in view of the evidence, which I shall not recapitulate.

It is claimed by the defendant that before the particular act of 1864 was enacted, these goods were known and imported as silks, and duty paid on them as silks, and that these plaintiffs concurred in the construction which was given to the previous law, and without objection paid the duty upon them as silks. You have heard the comments of counsel upon both sides in regard to that subject. The plaintiffs are not concluded by it. If they were under a mistake, it could be corrected. It is not claimed on the part of the defendants that the plaintiffs are concluded, and it is insisted on the part of the plaintiffs they are not. The evidence was relied upon as importing to your comprehension and your judgment that crapes were silks, and that they were so

understood, and that the plaintiffs paid duty thereon accordingly, and that it was only when the subsequent act was passed, changing the phraseology of the statute and raising a question of a somewhat different character in relation to the amount of duty, that the suggestion has arisen which has led to the present claim. So in regard to the testimony of various witnesses; there is some conflict. Some witnesses called by the plaintiff say that these goods were not known as silks, and that for many years they were not themselves aware that they were made of that material; while, on the other hand, there is the testimony of some importing merchants in New York and Boston, who tell you that, according to their understanding, and in trade and commerce, these goods are silks, —not only manufactured of silk, but that they have always been known in trade and commerce as silks. It is not for me to settle the question of fact in dispute between witnesses, or between parties, or to indicate to you any conclusion which you should draw from the evidence. It is purely a question for you. If the goods in question are not in commercial language known as silks, the plaintiff is entitled to recover; but if they are, the defendant is entitled to your verdict.

Verdict for the plaintiff.